**Robert G. TILTON, an individual, Plaintiff,**

v.

**CAPITAL CITIES/ABC INC., a New York corporation; et al., Defendants.**

No. 92–C–1032–BU.

United States District Court, N.D. Oklahoma.

June 19, 1995.

Sheila Miller Bradley, Ted J. Nelson, J.C. Joyce (argued), John C. Joyce, Joyce & Pollard, Tulsa, OK, for plaintiff.

Harvey D. Ellis, Jr., Clyde A. Muchmore (argued), Anton J. Rupert, Crowe & Dunlevy, Oklahoma City, OK, W. Kyle Tresch, Crowe & Dunlevy, Tulsa, OK, Floyd Abrams, Susan Buckley, David G. Januszewski, Edward P. Krugman, Cahill Gordon & Reindel, New York City, for defendants.

### ORDER

BURRAGE, District Judge.

On May 26, 1995, the Court entered an Order granting the Motion for Summary Judgment (Docket Entry # 244) filed by Defendants, American Broadcasting Companies, Inc., Robbie Gordon, Diane Sawyer and Kelly Sutherland and denying the Motion for Partial Summary Judgment (Docket Entry # 257) filed by Plaintiff, Robert G. Tilton. The following sets forth the Court's reasons for its decision.

On November 21, 1991, Defendant, American Broadcasting Companies, Inc. ("ABC"), broadcast on its weekly television news show *PrimeTime Live*, a program entitled "Men of God" which focused on—and was critical of—three televangelists, W.V. Grant, Larry Lea and Plaintiff, Robert G. Tilton. On July 9, 1992, ABC rebroadcast its original *PrimeTime Live* program, with some revisions and clarifications, and broadcast a follow-up segment reporting on additional information ABC had learned about Plaintiff after its original broadcast.[1] Defendant, Diane Sawyer, was the anchor and correspondent for both of the broadcasts. Defendant, Robbie Gordon, and Defendant, Kelly Sutherland,

were the producer and associate producer, respectively, for the specific reports concerning Plaintiff which were entitled "The Apple of God's Eye."

On November 11, 1992, Plaintiff commenced this diversity libel and false light invasion of privacy action against Defendants,[2] alleging that *PrimeTime I* and *PrimeTime II* broadcast three libelous and false light statements. Plaintiff, on May 13, 1993, moved the Court for entry of a temporary restraining order and a preliminary injunction barring ABC from rebroadcasting statements contained in the *PrimeTime Live* broadcasts. After a five-day evidentiary hearing, the Court denied Plaintiff's request for injunctive relief finding, *inter alia*, that Plaintiff had failed to demonstrate there was a substantial likelihood of recovery on the merits of his claims. Thereafter, Plaintiff amended his complaint setting forth additional allegations of libelous and false light statements made by Defendants in *PrimeTime I* and *PrimeTime II*. At the Court's directive, Plaintiff, on July 26, 1994, filed his Final Amended Complaint, which consolidated all of his claims against Defendants.[3] After conducting extensive discovery, Plaintiff has now filed his partial summary judgment motion, seeking judgment as to six segments of the broadcasts which allegedly contain libelous and false light statements. Defendants have also filed a summary judgment motion, seeking judgment as to all alleged libelous and false light statements.

 The parties agree that Plaintiff is a public figure. Thus, in order to prevail on his claims, Plaintiff must establish that the alleged defamatory statements are false and that Defendants acted with actual malice in publishing the alleged defamatory statements.[4] *Philadelphia Newspapers v. Hepps*,

---

1. The November 21, 1991 and the July 9, 1992 broadcasts shall be hereinafter referred to as *PrimeTime I* and *PrimeTime II* respectively.

2. Plaintiff also named Capital Cities/ABC, Inc. and ABC News, Inc. as Defendants. On May 24, 1995, the Court granted Capital Cities/ABC, Inc. and ABC News, Inc.'s summary judgment motion.

3. In addition to his libel and false light invasion of privacy claims, Plaintiff alleged an "equitable claim for permanent injunction" seeking to permanently enjoin the rebroadcast of any portions

of the *PrimeTime Live* broadcasts. In light of the Court's findings in this Order and the absence of any facts which brings Plaintiff's claim within one of the exceptions to the general rule that equity will not restrain libel or slander, *see*, *Schmoldt v. Oakley*, 390 P.2d 882, 886 (Okla. 1964), the Court finds that Defendants are entitled to summary judgment as to Plaintiff's claim.

4. As stated, Plaintiff has alleged both libel and false light invasion of privacy claims. Similar to libel, the tort of false light invasion of privacy requires proof that the challenged statements were false and that they were made with actual

475 U.S. 767, 775–78, 106 S.Ct. 1558, 1563–64, 89 L.Ed.2d 783 (1986); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967). The actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989). In order to prove actual malice, Plaintiff must show that Defendants acted with "knowledge that [the publication] was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. A reckless disregard for the truth requires more than a departure from reasonably prudent conduct. *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. at 2696. There must be sufficient evidence to support a conclusion that Defendants made the false publication with a "high degree of awareness of ... probable falsity," *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), or that Defendants "entertained serious doubts as to the truth of [their publications]." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The actual malice standard may be proven by indirect or circumstantial evidence. *Herbert v. Lando,* 441 U.S. 153, 170, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979). However, because First Amendment concerns are implicated, Plaintiff must prove actual malice with convincing clarity. *New York Times,* 376 U.S. at 285–286, 84 S.Ct. at 728–729.

■ As stated, Plaintiff must also establish falsity of the alleged defamatory statements in order to prevail on his claims. *Hepps,* 475 U.S. at 776–78, 106 S.Ct. at 1563–64; *Garrison,* 379 U.S. at 74, 85 S.Ct. at 215. In so doing, Plaintiff cannot simply point to minor inaccuracies in the challenged statements. Rather, he must show that the statements were not substantially true. As stated by the Supreme Court in *Masson v. New Yorker Magazine,* 501 U.S. 496, 516–517, 111 S.Ct. 2419, 2432–2433, 115 L.Ed.2d 447 (1991), it is "the substance, the gist or the

sting" of the alleged defamatory statements that are critical to the Court's analysis.

Unlike the element of actual malice, the Supreme Court has not addressed the appropriate standard of proof for falsity. *Harte–Hanks,* 491 U.S. at 661, n. 2, 109 S.Ct. at 2682, n. 2. The circuit courts, which have addressed the issue, have reached different conclusions. *Compare Firestone v. Time, Inc.,* 460 F.2d 712, 722–723 (5th Cir.) (Bell, J., specially concurring), *cert. denied,* 409 U.S. 875, 93 S.Ct. 120, 34 L.Ed.2d 127 (1972) and *Buckley v. Littell,* 539 F.2d 882, 889–90 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777 (1977) (expressing view that clear and convincing standard applies to issue of falsity) with *Goldwater·v. Ginzburg,* 414 F.2d 324, 341 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970) and *Rattray v. City of National City,* 36 F.3d 1480, 1487 (9th Cir.1994) (expressing view that preponderance of the evidence standard applies). However, in reaching its determination of the parties' motions, the Court need not make a definitive ruling in regard to the appropriate standard of proof. As will be discussed hereinafter, the Court finds Plaintiff's proof of falsity is inadequate even under the lesser standard of the preponderance of evidence in regard to several of his claims. As to other claims, the Court finds Plaintiff cannot establish the element of actual malice, and therefore, falsity need not be addressed.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the Court must draw all reasonable inferences from the record in favor of the party opposing summary judgment. *Brueggemeyer v. American Broadcasting Cos.,* 684 F.Supp. 452, 454 (N.D.Tex.1988). When the non-moving party bears the burden of proof at trial, summary judgment is warranted if

malice. *See, Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir.1983); *Colbert v. World Publishing Co.,* 747 P.2d 286, 291 (Okla.1987). Accordingly, the discussion in this Order concerning the falsity and actual malice elements applies to both the libel and false light claims.

the non-moving party fails to "make a showing sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a material factual dispute exists for trial, the Court views the evidence through a prism of the controlling legal standard. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus, in regard to the issue of actual malice,

> "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."

*Id.* ·at 255–56, 106 S.Ct. at 2514.

Applying the foregoing standards, the Court now examines the alleged libelous and false light statements in *PrimeTime I* and *PrimeTime II.*

### Haitian Orphanage

*PrimeTime I* reported:

> "SAWYER: [voice-over] *And what about this mission, Tilton's orphanage in Haiti? We kept thinking about Bob Jones and how he told us you could just fix yourself up a sign and claim an orphanage.*
>
> BROTHER BOB JONES: Put your name on there, whatever you want.
>
> SAWYER: [voice-over] *Tilton uses three different names for his Haiti orphanages,* so when we went to Haiti, we asked the government officials in charge of foreign missions if they'd heard of any of Tilton's orphanages. They said no.
>
> [interviewing] So nothing from Robert Tilton here?
>
> HAITIAN OFFICIAL: No."

*PrimeTime II* also reported:

> "SAWYER: [voice-over] *And what about this mission, Tilton's orphanage in Haiti? Well, remember Bob Jones* who told us for just a few thousand a month we could put up a sign and claim an entire orphanage, even if we weren't the only contributor.

BROTHER BOB JONES: Put your name on there, whatever you want.

SAWYER: [voice-over] So even though his magazine calls it the Robert Tilton Ministries Children's Home, *it's really not Tilton's place at all, which is why government officials we spoke to in Haiti hadn't heard of Tilton or his orphanage.*

[interviewing] So nothing from Robert Tilton here?

HAITIAN OFFICIAL: No."

In his motion and in response to Defendants' motion, Plaintiff contends that the underlined statements in the above-quoted segments of the *PrimeTime Live* broadcasts were false and were published by Defendants with actual malice. Plaintiff argues that the broadcasts falsely accused him of mail fraud by stating that he claimed to own and/or to provide financial support to a Haitian orphanage, when he did not. Plaintiff contends that neither he nor Word of Faith World Outreach Center Church ("Church") ever claimed to own an orphanage in Haiti and Defendants have never possessed any documents which shows that he or the Church ever made such a statement. Plaintiff contends that the Church did sponsor an orphanage in Haiti, World Harvest Orphanage, which was owned by Reverend Lee and Chris Sullivan. Plaintiff asserts that in 1985, Plaintiff, on behalf of the Church, sent one letter appealing for funds for the Haitian orphanage. Since 1985, however, neither he nor the Church has solicited funds for the Haitian orphanage. Plaintiff further asserts that he did not use three names to describe the Haitian orphanage as stated in *PrimeTime I.* Plaintiff concedes that the three names, including "Robert Tilton Ministries Children's Home," were used in his ministry magazine; however, he maintains the copy for the magazine articles, wherein the three names were referenced, was written by Reverend Lee Sullivan.

In regard to Defendants' statements as to Bob Jones, Plaintiff contends such statements tied Plaintiff's support of a Haitian orphanage to the "money laundering scheme" of Mr. Jones which was described in the segment of televangelist, W.V. Grant.[5]

---

**5.** According to Plaintiff, the broadcasts explained that Mr. Jones ran a money laundering scheme

whereby W.V. Grant would claim Mr. Jones'

Plaintiff contends that neither he nor the Church were in any way affiliated with Mr. Jones. Moreover, Plaintiff asserts that neither he nor his Church ever sent Mr. Jones money or conducted any business with him. Plaintiff contends that Ole Anthony, a Dallas minister, furnished Mr. Jones' name to Defendants and testified in the *Word of Faith World Outreach Center Church, Inc. v. Morales* case [6] that Mr. Jones had no connection with Plaintiff. Although Defendants were given a copy of Mr. Anthony's testimony prior to the *PrimeTime II* broadcast, Plaintiff states that they ignored the testimony and rebroadcast the statements implicating Plaintiff in Mr. Jones' scheme.

In addition, Plaintiff argues that Defendants knew, prior to the broadcast of *PrimeTime I*, that only a few orphanages were registered with the Haitian government. Plaintiff specifically cites to Defendant, Kelly Sutherland's notes of an interview with Fritz Artistyl in Haiti, which included the statement, "149 registered. 700 working w/o legal status," and her notes on the back of a photograph picturing World Harvest Orphanage, which included the statement, "did a survey found 700 additionally on Haitian soil—only 148 registered." (Joyce Aff., Ex. 42, Ex. 43). Plaintiff also argues that Ms. Sutherland knew, prior to the broadcast, that Plaintiff did in fact sponsor an orphanage in Haiti as she knew the name of the orphanage and the names and addresses of the Sullivans, who owned the orphanage. Plaintiff asserts that Defendants, Diane Sawyer and Robbie Gordon, also knew, prior to the broadcast, that Plaintiff supported an orphanage in Haiti. Plaintiff states that Ms. Gordon's knowledge is shown by a memo sent to Ira Rosen, senior producer for *PrimeTime Live*, on July 23, 1991, stating that she did not expect to find out that Plaintiff's missions were nonexistent. (Joyce Aff. Ex. 38). Although Defendants had knowledge that Plaintiff sponsored an orphanage in Haiti, Plaintiff argues that Defendants knowingly broadcast the *PrimeTime I* segment claiming that they could not find any orphanage. Plaintiff further argues that

despite the information obtained prior to *PrimeTime I* and the evidence obtained from Plaintiff after *PrimeTime I* aired, Defendants knowingly rebroadcast similar false statements in *PrimeTime II*.

Defendants, in response to Plaintiff's motion and in support of their motion, contend that even if Plaintiff's statements that he never "owned" an orphanage in Haiti; that he did contribute money to World Harvest Orphanage; that after 1986, he did not solicit funds for World Harvest Orphanage; and that he never associated with or knew Bob Jones were true, the broadcasts at issue did not report any such facts. Defendants contend that the broadcasts never said Plaintiff owned an orphanage. Indeed, Defendants state that *PrimeTime II* specifically stated "even though his ministry magazine calls it the Robert Tilton Ministries Children's Home, it's not really Tilton's place at all." Defendants assert *PrimeTime I* stated that they could not find any of the three orphanages identified in Plaintiff's ministry magazine and other promotional materials and *PrimeTime II* stated that they could not find "Robert Tilton Ministries Children's Home." Defendants contend that they accurately reported in *PrimeTime I* that they could not find any of the three named orphanages. According to Defendants, the evidence shows that they conducted an exhaustive investigation to find the orphanages, including World Harvest Orphanage, but could not locate any of them. Defendants argue that they accurately reported that the Haitian officials had neither heard of Plaintiff nor any of the orphanages identified in Plaintiff's magazine and other promotional materials. Defendants also argue that they accurately reported in *PrimeTime II* that the Haitian officials had neither heard of Plaintiff nor Robert Tilton Ministries Children's Home. Although Plaintiff claims that he did not write the copy for the magazine articles which identified the three orphanages, Defendants contend that he was the publisher of the magazine.

As to Bob Jones, Defendants contend they never stated that Plaintiff was associated

---

orphanage and send money to Mr. Jones for the orphanage and then Mr. Jones would return a kickback to him from the money received.

6. *Word of Faith World Outreach Center Church, Inc. v. Morales,* 787 F.Supp. 689 (W.D.Tex.1992), *rev'd* 986 F.2d 962 (5th Cir.1993).

with or knew Mr. Jones. They contend the broadcasts stated that the canvas sign on the Haitian orphanage featured in Plaintiff's magazine brought to mind the statements of Mr. Jones. Defendants maintain Plaintiff cannot present any evidence to show that the canvas sign did not bring those statements to mind. In addition, Defendants state that Plaintiff cannot and has not disputed the accuracy of the quote attributed to Mr. Jones that just for a few thousand dollars a month "you could just fix up a sign and claim an orphanage" in Haiti. Defendants further state that the quote is accurate as to Plaintiff since the canvas sign on the Haitian orphanage featured in his magazine was hung only once and for the explicit purpose of photographing it.

Having reviewed the challenged segment of the broadcasts and the evidence applicable thereto, the Court finds Plaintiff has failed to establish that he is entitled to judgment as a matter of law in regard to the segments. The Court also finds that Plaintiff has failed to present sufficient evidence, even under a preponderance of the evidence standard, to raise a genuine issue of fact as to the falsity of the segments so as to defeat Defendants' motion. In addition, the Court finds that Plaintiff has failed to raise a genuine issue of fact as to whether Defendants knew of the alleged falsity of the segments or entertained serious doubts as to their truth.

■ Despite Plaintiff's assertions to the contrary, the broadcasts at issue did not state that Plaintiff owned a Haitian orphanage nor did they report that Plaintiff did not provide any support to an orphanage in Haiti. *PrimeTime I* stated that the Haitian officials had not heard of any of the three orphanages identified in Plaintiff's magazine[7] and *PrimeTime II* stated that even though the Plaintiff's magazine called the mission, Robert Tilton Ministries Children's Home, it was not his place at all and Haitian officials had not heard of Plaintiff or his orphanage. Plaintiff has alleged that since Defendants knew the name of the orphanage sponsored by Plaintiff's Church and the individuals who ran it, Defendants could have and should have located the orphanage. However, it is undisputed that Defendants, prior to the broadcast of *PrimeTime I*, did attempt to locate World Harvest Orphanage and specifically questioned Haitian officials about that orphanage. The evidence also reveals that even though Defendants had the names and addresses of the Sullivans, they were unable to locate them in both Haiti and Dallas. Although Plaintiff may contend that Defendants were negligent in failing to find the orphanage, such claim does not support a finding of actual malice. *Masson,* 501 U.S. at 509, 111 S.Ct. at 2428 (mere negligence does not suffice to prove actual malice).[8] As to *PrimeTime II*, Defendants merely reported that Robert Tilton Ministries Children's Home identified in Plaintiff's magazine was not his orphanage and Haitian officials had not heard of him or the orphanage. Plaintiff has failed to present any evidence to show that such report was false or that it was made with knowledge of the falsity or with serious doubts as to its truth.[9]

7. Although Plaintiff argues that he did not "use" three names for the orphanage he sponsored as he did not write the copy for magazine articles, the undisputed evidence shows that Plaintiff was the publisher for the magazine. Consequently, the Court opines that no reasonable juror would conclude that Plaintiff was not responsible for the use of the three names to describe the orphanage in Haiti.

8. Plaintiff contends that Defendants purposefully avoided the truth when Jeff Cooke failed to ask about the location of the Haiti orphanage or the names of its pastors during a job interview with Mike Groves. While purposeful avoidance of the truth may suffice to prove actual malice, *see, Harte–Hanks,* 491 U.S. at 692, 109 S.Ct. at 2698, the videotape submitted to support that contention does not show Mr. Cooke's interview with Mike Groves. Notwithstanding, the Court finds that Mr. Cooke's failure to ask the location of the Haiti orphanage does not in and of itself demonstrate an avoidance of the truth. Moreover, Plaintiff has failed to show that Mike Groves would have been privy to that information and would have disclosed that information to Mr. Cooke during his job interview.

9. In attempting to demonstrate actual malice with respect to *PrimeTime II*, Plaintiff argues that prior to the broadcast of *PrimeTime II*, his attorney provided Defendants with information evidencing Plaintiff's contributions to an orphanage in Haiti. However, as stated, *PrimeTime II* did not say that Plaintiff provided no support to an Haitian orphanage. Instead, it reported "[s]o even though his magazine calls it the Robert Tilton Ministries Children's Home, it's not really

■ Likewise, the Court finds that the broadcasts did not state that Plaintiff knew or was associated with Bob Jones. *Prime-Time I* stated that "[w]e kept thinking about Bob Jones and how he told us you could just fix yourself up a sign" and *PrimeTime II* stated "[w]ell, remember Bob Jones who told us for just a few thousand a month we could put a sign and claim an entire orphanage, even if we weren't the only contributor." Defendant, Robbie Gordon, has testified that the canvas sign on the Haitian orphanage which was featured in Plaintiff's magazine and was shown on the broadcasts brought to mind the statements of Mr. Jones. Plaintiff has failed to present sufficient evidence to show that the canvas sign did not bring Mr. Jones to mind to Defendants.[10]

Plaintiff has alleged that Defendants falsely accused Plaintiff of mail fraud in the broadcasts. Plaintiff, however, has failed to present sufficient evidence to demonstrate an intent or awareness on the part of Defendants that they implicitly accused him of such conduct. *See, Newton v. National Broadcasting Co.,* 930 F.2d 662, 681 (9th Cir.1990) (not permissible to uphold jury verdict on basis that "because the broadcast may be capable of supporting the impression [plaintiff] claims, [defendant] must therefore have intended to convey the defamatory impression at issue"); *Saenz v. Playboy Enterprises, Inc.,* 841 F.2d 1309, 1319 (7th Cir. 1988) (to show actual malice, plaintiff must prove "with clear and convincing evidence that the defendants intended or knew of the defamatory implications"); *Woods v. Evansville Press Co.,* 791 F.2d 480, 487 (7th Cir. 1986) (actual malice not shown where "there is no evidence that the defendants ... shared the plaintiff's interpretation of [article] or intended that the [article] be read to contain the defamatory innuendos the plaintiff attributes to it").

### Holy Water—Response Media

■ *PrimeTime I* and *PrimeTime II* reported the following:

> Tilton's place at all, which is why government officials we spoke to in Haiti hadn't heard of Tilton or his orphanage."

"SAWYER: [voice-over] Tilton sends out an avalanche of things he asks viewers to sent back to him—'miracle prayer cloths' he promises to touch and place upon an altar, cords he says he'll place on a 'wall of deliverance,' arrows he'll use to take aim at a sufferer's needs, a tracing—place your hand there and he'll put his hand there too. There's holy water from the River Jordan, 'miracle anointing oil'—though Moore said some of the items come from that holy place Taiwan.

MR. MOORE: We get stuff from Taiwan."

Plaintiff, in support of his motion and in response to Defendants' motion, contends that the statements in these segments of *PrimeTime I* and *PrimeTime II* were false in that they accused Plaintiff of mail fraud by stating that he sends to his followers holy water from Taiwan rather than from the River Jordan as represented. Plaintiff contends that the evidence clearly shows that the holy water sent to his followers came from the River Jordan. He also contends that ABC's raw footage from the interview with Jim Moore shows that he never said any of Plaintiff's mailing items came from Taiwan. According to Plaintiff, Mr. Moore's statement "[w]e get stuff from Taiwan" had nothing to do with Plaintiff's mailings items. Plaintiff states that Mr. Moore was obviously distracted when he answered the question posed by Defendant, Robbie Gordon. Plaintiff also states that ABC's raw footage of the discussion between Ms. Gordon, Ole Anthony and Jeff Cooke following the interview clearly demonstrates that Defendants recognized they lacked any evidence to support their statement in the broadcasts. Specifically, Plaintiff points to Ms. Gordon's statements that she would like to know where they "get the—that Lord's water and a couple of other things;" that she didn't "feel like we've got him nailed right now;" and that she "really wanted to get him to say that stuff is not

---

**10.** In his briefs, Plaintiff contends that Ms. Gordon and Ms. Sutherland showed Mr. Jones the picture of the canvas sign featured in the Church's magazine and led him to make the statement about the sign. Nevertheless, Plaintiff does not dispute that Mr. Jones made the statement to Defendants. Nor does he present any affirmative evidence to establish that the picture of the canvas sign did not bring Mr. Jones' statement to mind.

from the River Jordan." (Joyce Aff., Ex. 18 at pp. 71, 110, 112). Plaintiff also states that ABC's notes clearly show what ABC wanted to say in the broadcasts as they state that "Tilton's miracle waters and oils, cloths, etc.—most come from Taiwan—though they imply they are from the Holy Land or somehow anointed" and "[t]he miracle waters, oils, replicas of widow's mites, etc.—many come from Taiwan, though they imply they are from the Holy Land or they are somehow anointed." (Joyce Aff., Ex. 19, Ex. 20). Plaintiff further contends that Defendants knew that their statement about the holy water was false because prior to the rebroadcast on *PrimeTime II*, Plaintiff advised Defendants that the allegations regarding the holy water were false and enclosed evidence to prove that the holy water came from the River Jordan. Furthermore, Plaintiff argues that Defendants knew that their accusation Plaintiff misrepresented Taiwanese water as River Jordan water was an accusation Plaintiff committed mail fraud as Defendant, Diane Sawyer, specifically asked John Brugger of the United States Postal Service in an interview if "the stuff they send out, the, the holy water ... in fact, it comes from Taiwan. If they don't actually say where it comes from, again you can't— ... It has to be fairly specific?" (Joyce Aff., Ex. 21 at p. 15, Ex. VT–21).

Defendants, in response and in support of their motion, contend that the challenged segments did not state that the holy water came from Taiwan nor did they accuse Plaintiff of mail fraud. Rather, the broadcasts stated that some of the other items mailed to Plaintiff's followers came from Taiwan. Defendants also state that the gist of their segments was substantially true. According to Defendants, the gist of the challenged segments was that Plaintiff obtained inexpensive items for his mailings. Defendants state that discovery has confirmed the gist as some of Plaintiff's mailing items came from Hong Kong. In addition, Defendants argue that Plaintiff cannot show actual malice with respect to the broadcasts as Ms. Gordon has testified she believed that Response Media obtained some of Plaintiff's mailing items from Taiwan. Defendants stated that Mr. Moore also testified that it was possible for Ms. Gordon to have interpreted his com-

ments to mean the mailings came from Taiwan. In regard to ABC's notes referred to by Plaintiff, which were sent to Ms. Sawyer by Ms. Gordon before Ms. Sawyer's interview with Mr. Brugger and which contained comments that "many" or "most" of Plaintiff's "miracle waters and oils, cloths, etc." came from Taiwan "though they imply they are from the Holy Land or they are somehow anointed," Defendants contend that the notes do not support a finding of actual malice. Defendants argue that if they "wanted to say" that "many" or "most" of the mailing items came from Taiwan in the broadcasts, they could have. Likewise, if they wanted to accuse Plaintiff of mail fraud, they could have. Defendants, however, state that neither broadcast contained such statements.

Upon review of the record related to the challenged segments, the Court finds that Plaintiff has failed to show that he is entitled to judgment as a matter of law and has failed to raise a genuine issue of fact in response to Defendants' summary judgment motion as to the element of actual malice. The challenged segments did not, as Plaintiff argues, state that holy water came from Taiwan nor did they explicitly accuse Plaintiff of mail fraud. Even though Plaintiff contends that the broadcasts imply such facts, Plaintiff has failed to produce adequate evidence to establish that Defendants intended or knew that the broadcasts implied such facts. *See, Saenz,* 841 F.2d at 1318. Plaintiff has presented evidence to show that none of the items obtained for his mailings came from Taiwan. However, Plaintiff has not presented sufficient evidence to establish that Defendants knew that their statement "though Moore said some items come from that holy place Taiwan" was false or that they subjectively entertained serious doubts as to its truth. Plaintiff cites to Defendant, Robbie Gordon's remarks "I would like to know, just out of curiosity, where they get the—that Lord's water and a couple of other things;" "I really wanted to get him to say that stuff is not from the River Jordan, but I think he ..." and "I don't think we have him nailed right now" to support his allegations of actual malice. These remarks, however, do not establish that Defendant did not believe that some of the items for Plaintiff's mailing came

from Taiwan. Indeed, it is apparent from the transcript of the interview with Mr. Moore that Ms. Gordon's "nailed" remark was not directed at the holy water or other mailed items as argued by Plaintiff.[11] As there is an absence of clear and convincing evidence of Defendants' subjective awareness of alleged falsity, the Court concludes that Plaintiff's attack on the challenged segments must fail.

■ *PrimeTime I* and *PrimeTime II* also reported:

"SAWYER: [voice-over] So we decided to take hidden cameras to see what we could learn about Robert Tilton's fund-raising. It led us first to the nerve center of his ministry, the company that organizes his direct mail. It's called Response Media.

JIM MOORE: Bob is doing far better than anyone knows.

SAWYER: [voice-over] Jim Moore is president of Response Media. He handles not only Tilton, but a number of big corporate accounts. We told Moore that we were media consultants for this man, Dallas minister Ole Anthony. We asked him to show us how to start a big money ministry like Tilton's.

MR. MOORE: Give them something for free. You know, we want to mail you the latest copy of "X" and get their name and address. New names is the key, new names. Just think, 'New names.'

SAWYER: [voice-over] We learned that once people give you their names, its easy to keep them on the hook. You mail them something with a gimmick in it.

MR. MOORE: First of all, when you send an item in it, it gets their attention. That's number one.

\* \* \* \* \* \*

SAWYER: [voice-over] The letters accompanying the items are written by ghost writers to pressure followers to write back and make donations, too. Does it work? People send them in by the truckloads. It's a great marketing scheme.

\* \* \* \* \* \*

SAWYER: [voice-over] And when the letters arrive, they're processed so the company knows which fund-raising appeals you can use to squeeze followers for the most donations.

Mr. MOORE: We take the clients' files and we run them up against demographic information and create a profile of who their people are, how many people have cars that are new—

SAWYER: [voice-over] So it's market research, not God, who can tell Tilton which appeals reach the richest donors, which illnesses create the most dollar opportunities."

In their motion, Defendants contend that Plaintiff cannot prevail on his challenges of these segments of the broadcasts concerning Defendants' description of Response Media as the "nerve center" or "the company who organizes his direct mail" and their statements that "the letters accompanying the items are written by ghost writers to pressure followers to write back and make donations, too. It's a great marketing scheme." Defendants contend that even though Plaintiff argues that Response Media was "only a printer" for him and that "[Internal Data Management] handled the mail" for him, Mr. Moore, during his interview, described Response Media's role far more than that of "only a printer." According to Defendants, Mr. Moore described to Mr. Anthony, Ms. Gordon and Mr. Cooke, a wide range of services Response Media could provide to a ministry and indicated that he performed such services for Plaintiff. The described services included sophisticated direct mail

---

**11.** In his briefs, Plaintiff argues that Ms. Gordon could not have believed that Mr. Moore was referring to Plaintiff's mailing items when he said "[w]e get stuff from Taiwan." Plaintiff states that Mr. Moore, Mr. Anthony, Ms. Gordon and Mr. Cooke had left the room where the display of the Church's button mailing was located and Ms. Gordon, when asking her question to Mr. Moore, was pointing to the far wall of the room they were in at the time. Plaintiff states

that it is clear that Mr. Moore was distracted when the question was asked. However, the Court finds that such facts do not establish that Ms. Gordon did not understand Mr. Moore to be referring to Plaintiff's mailing items. The transcript of the interview reveals the parties had been looking at wall displays of fund-raising activities, one of which included a button mailing of Plaintiff's Church. Ms. Gordon's question to Mr. Moore referenced buttons.

strategies, market research techniques and statistical analyses. He also explained the process of handling the direct mail. In addition, with respect to Plaintiff's ministry, Defendants contend that Mr. Moore portrayed himself as responsible for Plaintiff's success, claiming that Plaintiff "was out of business" prior to his association with Response Media. According to Defendants, Mr. Moore told his interviewees that he commuted to Dallas every day for two years, and in reference to assistance he provided to Plaintiff in reorganizing his ministry, Mr. Moore stated that he "worked with them." Mr. Moore further indicated that Response Media did the media buying for Plaintiff's Church. In light of these representations, Defendants contend they believed that Response Media was the "nerve center" of Plaintiff's Church and the "company that organizes his direct mail."

Defendants also contend that discovery has confirmed Response Media served Plaintiff's ministry as more than a printer. Defendants state that the evidence shows Response Media acted as a consultant to the Church with respect to its mailings. Mr. Moore participated in meetings at which mailing strategies and results were discussed and analyzed. In addition, Response Media created a demographic study for Plaintiff's Church.

Even if Response Media were "only a printer" and Internal Data Management handled the direct mail operation for Plaintiff, Defendants contend that the gist or substance of the challenged segments was substantially true. According to Defendants, the gist of the broadcasts was that Plaintiff utilized a sophisticated direct mail operation which effectively brought in large amounts of contributions. Defendants argue that there is no dispute that such was the case, whether the direct mail operation was conducted by Response Media or Internal Data Management.

As to the statement in the broadcasts that Plaintiff's letters were written by ghost writers, Defendants state that such statement was true. Defendants contend that Kathryn Ingley, the Church's manager of partner correspondence, described herself as a ghost writer for Plaintiff. Defendants also assert that Plaintiff testified that he had the concept in the letter but that it was the responsibility of Internal Data Management employees as subordinates to put the letter in mailable form. Defendants further argue the evidence reveals the employees of Internal Data Management reviewed the prayer partners' letters, selected the responses to them and then mailed them out over Plaintiff's signature.

In response to Defendants' motion, Plaintiff disputes that Response Media was the nerve center. He also disputes the accuracy of Defendants' characterization of Mr. Moore's statements during the interview. While Plaintiff concedes Mr. Moore indicated that Response Media could perform a wide range of services, he contends that Mr. Moore did not state he performed such services for Plaintiff. Additionally, Plaintiff disputes the accuracy of Defendants' statement that Mr. Moore claimed credit for Plaintiff's financial success. Plaintiff states that Mr. Moore never made such a statement and in fact, the evidence shows that he was not responsible for the success. Plaintiff further asserts that Mr. Moore did not claim to do the media buying for Plaintiff. Rather, he stated that the "downtown office" did the media buying, referring to J.C. Joyce's office. Plaintiff further denies Defendants' contention that Mr. Moore was a consultant for Plaintiff. Plaintiff states that Mr. Moore was only a technical advisor involved in the layout and design of the mailing. Furthermore, Plaintiff states that Mr. Moore has only performed one profile of the Church's mailing and the Church did not use the information.

The Court, upon review of the challenged segments of the broadcasts and the record thereof, finds that Plaintiff has failed to satisfy his burden to overcome summary judgment as to the issue of actual malice in regard to Defendants' description of Response Media as the "nerve center" and as "the company that organizes his direct mail." Plaintiff has failed to provide affirmative evidence to demonstrate that Defendants knew their statements were false.[12] The transcript

12. In any event, the Court finds Defendants' characterization of Response Media as the "nerve center" is non-actionable as it is an opinion which is not susceptible to proof of its truth or falsity. *See, e.g., Metcalf v. KFOR–TV,* 828 F.Supp. 1515, 1529–32 (W.D.Okla.1992).

of the interview with Mr. Moore reveals that Mr. Moore did indicate or at least suggest that he performed a wide variety of services for Plaintiff. Moreover, Mr. Moore told Ms. Gordon, Mr. Anthony and Mr. Cooke that he had commuted to Dallas for two years to work with Plaintiff's ministry and that he had been the one responsible for moving direct mailing services from in-house to Tulsa. The transcript, contrary to Plaintiff's contention, also shows that Mr. Moore did in fact take credit for Plaintiff's success. Indeed, in the interview, Mr. Moore stated:

"[w]hen I got associated with Bob he was about out of business. . . .

\* \* \* \* \* \*

He was having a very difficult time. In fact, almost—I don't know if he knew what to do at the time. When he first came on, the first mailing program that we did with him he, he tried to convince me—he went—he wanted to go with this real slick—. . . .

\* \* \* \* \* \*

And what he felt would work and what would actually work were two different things. And once he saw that this wouldn't work, he was willing to go with this . . .

\* \* \* \* \* \*

Bob, is, is doing far better than anyone knows."

(Joyce Aff., Ex. 18 at pp. 91–92).

These statements clearly demonstrate that Mr. Moore claimed credit for Plaintiff's success. Furthermore, in regard to Mr. Moore's statement as to media buying, the Court concludes that the statement, at the very least, is ambiguous and in the Court's view, could be understood by Defendants as indicating that Mr. Moore and Response Media played a part in media buying.[13] As to demographic analysis, Plaintiff has not submitted specific facts to show that Defendants knew that the statements in regard to Response Media's participation in such activity was false or that they subjectively entertained serious doubts that their statements were false.

 ▮ In regard to Defendants' statement concerning ghost writers, the Court finds that Plaintiff has failed to present sufficient evidence, even under a preponderance of the evidence standard, to establish that the statement was false. Moreover, the Court finds that Plaintiff has not shown with convincing clarity that Defendants knew such statement was false or had serious doubts as to its truth. The undisputed evidence shows that Kathryn Ingley and others wrote letters for Plaintiff and that Ms. Ingley considered herself as a ghostwriter. It is also undisputed that Internal Data Management employees reviewed letters from prayer partners, selected responses to those letters and then sent them out over Plaintiff's signature. Even though Plaintiff claims that the broadcast implies that the employees of Response Media were ghostwriters for the letters, the Court concludes that the gist of Defendants' statement is substantially true as Kathryn Ingley as well as Internal Data Management employees wrote letters or selected responses on behalf of Plaintiff.[14]

As to remainder of the challenged statement involving ghost writers and the statements concerning letters sent and received from followers, the Court finds that Plaintiff cannot satisfy his burden of proof that Defendants made the statements with knowl-

---

**13.** The transcript of the interview reads:

"Jim Moore: He's [referring to Plaintiff], He's on more stations, more market—I, I don't think anyone's on as many stations as he is or as many times.

Ole Anthony: Are—now, do—now, do you do the time buying for that kind of stuff?

Jim Moore: No, and Bob—we—a friend of mine—see, I used to do all the media buying at, at Oral's when I was there. And a friend of mine that used to work there, I had him do the media buying for him initially to get him started. Then we are doing it here in Tulsa, but out of the downtown office."

(Joyce Aff., Ex. 18 at p. 92).

**14.** The Court also notes that Plaintiff challenges statements made in the follow-up segment of *PrimeTime II* with respect to the drafting of mailings. The statements were attributed to Marte Tilton from a deposition. In that deposition, Ms. Tilton acknowledged that the handwriting on personal letters to Plaintiff's followers was not Plaintiff's handwriting. She also admitted that letters sent to Plaintiff's Church by individuals seeking spiritual guidance were answered by individuals hired by the data processing center in Tulsa. In this action, Ms. Tilton has attested to the accuracy of those comments and Plaintiff has not presented evidence to the contrary. Therefore, Plaintiff's attack to those statements fail.

edge of falsity or doubts as to their truth. As to Defendants' statements "[i]t's a great marketing scheme" and "So it's market research, not God, who can tell Tilton which appeals reach the richest donors, which illnesses create the most dollar opportunities," the Court finds that such statements are non-actionable as statements of opinion, not verifiable as true or false. *See, Metcalf v. KFOR–TV*, 828 F.Supp. 1515, 1529 (W.D.Okla.1992) ("statements which are opinionative and not factual in nature, which cannot be verified as true or false, are not actionable as slander or libel"); *Miskovsky v. Oklahoma Pub. Co.*, 654 P.2d 587, 593 (Okla. 1982) (opinion or "judgmental statement in which the maker of the same expresses his views" cannot be libelous).[15]

### Prayer Requests

■ *PrimeTime I* and *PrimeTime II* reported:

"SAWYER: [voice-over] But how much does Tilton really care about the beat-up and the hurting? We kept thinking about something the head of the direct mail operation told us, that the mail doesn't go to Tilton. It's forwarded unopened to Tilton's bank in Tulsa. So the bank opens the followers' mail, not to share the agony, but to get the money.

INTERVIEWER: The bank opens the letters that come back in?

MR. MOORE: Right. And takes your money and puts it in your account. All we get is the paper document and how much the person gave.

SAWYER: [voice-over] And those items that people have prayed over and sent in, believing Robert Tilton would take them and pray over them too? If some make it to Tilton, there are thousands that didn't. We found them in the garbage at the bank and the marketing research center. The 'angels of god,' the prayer cords, the arrows—this person wanted his aimed at getting a real dad—the tracing where Tilton said he'd place his hand, ripped up by [*PrimeTime I*: the bank] [*PrimeTime II*:

letter processors]. We found heart-breaking appeals from followers and letters like this one. It came with personal photographs for Pastor Bob and a prayerful message. It also came with a seven thousand dollar pledge. The money probably made it to Tilton. The prayers went in the trash."

Plaintiff, in support of his motion and in response to Defendants' motion, contends that the above-quoted segments are false. Plaintiff contends that Response Media did not receive any prayer requests from the bank as stated by the broadcasts. Plaintiff asserts that his mail processor, Internal Data Management, received all the prayer requests. Moreover, Plaintiff contends that Mr. Moore never told Ms. Gordon, Mr. Anthony and Mr. Cooke, during their interview, that he received "the paper document [or] how much the person gave" in regard to Plaintiff's mail. Nor did Mr. Moore state that "mail doesn't go to Tilton." Plaintiff states that prayer requests were sent to him from Internal Data Management. In addition, Plaintiff contends that the statement "[a]nd those items that people have prayed over and sent in, believing Robert Tilton would take them and pray over them, too" was false because the visual shown at the time the statement was made, does not show items prayed over and sent in by followers. Rather, the pictured mail was actually prayer request forms that Plaintiff's Church had sent to Defendant, Kelly Sutherland, at her request, but which had never been completed and returned to the Church. Plaintiff also states that Defendants produced videotapes shot in Dallas with techniques to make the small quantity of the Church's mail they had "look voluminous." Plaintiff further contends Defendants' statements that "[i]f some make it to Tilton, there are thousands that didn't" and "we found them in the garbage at the bank and the marketing research center" were false. According to Plaintiff, Defendants never found any prayer requests in the

---

15. In his Final Amended Complaint, Plaintiff challenges the statements made in *PrimeTime I* and *PrimeTime II* attributed to "Tilton's marketing director" that "when it comes to money, Tilton is very smart. He's careful not to say what donation goes where so he can avoid, again, how Jim and Tammy got caught." Upon review of the record, the Court finds that Plaintiff cannot show by clear and convincing evidence that Defendants knew the alleged falsity of the statements or entertained serious doubts as to their truth.

garbage at the bank or the marketing center which had been placed there by employees. Nor could they find "thousands" of prayer requests. Plaintiff contends the evidence in the record establishes that no mail which was opened by Commercial Bank and Trust had any contents removed or thrown away and that no mail received by Internal Data Management was ever disposed of in its dumpster. Indeed, Plaintiff states that an employee of the janitorial service, who personally emptied the trash for Commercial Bank and Trust and Internal Data Management, wrote a letter to Defendant, Diane Sawyer, stating that no prayer requests were thrown away.

In addition, Plaintiff contends that Defendants acted with actual malice in publishing the false statements. In making the statements, Defendants relied upon Mr. Anthony, who purportedly found the trashed prayer requests. However, Plaintiff asserts that Defendant, Kelly Sutherland, was advised by Peggy Wehmeyer, now ABC's religious editor, that Mr. Anthony could not be trusted and was obsessed with his crusade against Plaintiff. Plaintiff states that Ms. Sutherland's testimony, as well as Ms. Gordon's testimony, that they believed Mr. Anthony had found the prayer requests in the trash cannot be relied upon as their credibility is at issue. Plaintiff additionally states that Defendants acted with actual malice in rebroadcasting the statements on *PrimeTime II* because they were advised by Plaintiff, after *PrimeTime I* aired, the accusations were clearly false. Plaintiff specifically provided the trial transcript and exhibits of the *Morales* case to Defendants which showed that there were never thousands of prayer requests thrown in the trash.

Furthermore, Plaintiff alleges that Defendants acted with actual malice because the evidence reveals that Defendants or their agents stole prayer requests from Commercial Bank and Trust and Internal Data Management and stole handwritten letters referred to as "white mail" from the Church's sanctuary and planted 37 of the prayer requests in the trash to support their report. Plaintiff contends that Internal Data Management has the original envelopes which contained the prayer requests that Defendants claimed in the broadcasts were found in the trash dumpsters. These envelopes, Plaintiff argues, prove the prayer requests were stolen and then were placed back in the bank without the prayer requests and with only a token offering. Plaintiff argues that Defendants or their agents stole the envelopes. Plaintiff contends that Defendants filmed Mr. Anthony removing trash containing prayer requests behind the dumpsters at the Commercial Bank and Trust and took video and still pictures showing prayer requests at that location. Defendants also took video and still pictures at Internal Data Management. The video and still pictures, Plaintiff argues, were destroyed by Defendants.

Defendants, in response and in support of their motion for summary judgment, contend that Plaintiff cannot show with convincing clarity that Defendants acted with actual malice with respect to the broadcasts. Defendants contend that Ms. Gordon has testified that Mr. Anthony told her, after their interview with Mr. Moore, that he and two of his colleagues, Powell Holloway and Harry Guetzlaff, intended to look through the trash outside Commercial Bank and Trust. Ms. Gordon and Ms. Sutherland have testified that Mr. Anthony had told them that he and his colleagues had examined the trash outside Commercial Bank and Trust, Internal Data Management and the law offices of J.C. Joyce, counsel for Plaintiff. Ms. Gordon also has testified that Mr. Anthony reported that he and his colleagues had discovered thousands of items of trash. Ms. Gordon and Ms. Sutherland further testified that on different occasions, they inspected trash which Mr. Anthony said he had found during his "trash trips" and that they believed Mr. Anthony accurately reported what he had found. Although Plaintiff contends that Ms. Sutherland had been advised that Mr. Anthony was not trustworthy and was obsessed with Plaintiff's crusade, Defendants contend that Plaintiff has shown nothing to rebut Defendant's testimony that she believed that Mr. Anthony had retrieved the prayer requests from the trash. Moreover, Defendants contend that the evidence Plaintiff has presented to challenge the credibility of Ms. Gordon and Ms. Sutherland has nothing to do with their belief that Mr. Anthony recovered prayer requests in the trash of the bank and the marketing research center. Furthermore,

Defendants contend that Plaintiff has failed to present any evidence to support his accusations that Defendants stole prayer requests or planted stolen prayer requests in the trash dumpsters.

In addition to actual malice, Defendants contend that Plaintiff has failed to meet his burden of proof as to the issue of falsity. Despite Plaintiff's attacks on certain statements of the broadcasts, Defendants maintain that the gist or sting of the broadcasts was demonstrably true. According to Defendants, the gist of the reports was Plaintiff's preoccupation with money, a focus that led him to take the most stringent steps to assure that every penny he received from followers was deposited in the bank at the same time the prayers of those followers were treated with callous indifference. Defendants contend that the evidence has in fact revealed that thousands—hundreds of thousands—of prayer requests mailed to Plaintiff were thrown away, pursuant to Plaintiff's directive, without being prayed over by him. Defendants state that at least 180,000 P–21B and P–21C prayer forms [16] of Plaintiff's followers were trashed and that tens of thousands of other responses to Plaintiff's mailings were, as well, trashed. Additionally, Defendants contend that tens of thousands of handwritten letters from followers were routinely discarded. Defendants acknowledge that Plaintiff did receive a computer printout with cryptic codes referencing the form letters that Internal Data Management employees sent back to the followers. However, Plaintiff never told his followers that he prayed over the computer printouts instead of the original prayer requests. Defendants contend that all of the undisputed evidence reveals that Plaintiff did not in fact personally pray over thousands of prayer requests that were mailed to him.

The Court, having carefully reviewed the evidence submitted, finds that Plaintiff has not presented sufficient evidence to raise a genuine issue of fact as to whether Defendants acted with actual malice in regard to their reports. Plaintiff has failed to present sufficient evidence to show that Defendants knew or were aware the statements concerning Mr. Moore were false. Moreover, Plaintiff has failed to present any evidence to show that Defendants did not believe that the "mail doesn't go to Tilton." Plaintiff has additionally failed to sufficiently rebut the testimony of Ms. Gordon and Ms. Sutherland concerning Mr. Anthony's report of trashed prayer requests, their inspection of the prayer requests which Mr. Anthony stated were trashed and their belief that his report was accurate. Plaintiff claims that the credibility of Ms. Gordon and Ms. Sutherland is at issue and therefore their testimony cannot support summary judgment on the issue of actual malice. However, the evidence presented to attack the credibility of Ms. Gordon and Ms. Sutherland does not relate to Mr. Anthony, the trash trips conducted by Mr. Anthony or whether they believed Mr. Anthony retrieved the prayer requests from the trash. Moreover, the fact that Ms. Sutherland was advised that Mr. Anthony was not a credible source does not establish actual malice. Ms. Sutherland testified that in fact the majority of information Mr. Anthony provided to her in regard to Plaintiff and his Church was accurate. Plaintiff has not shown that such testimony is untrue or that Ms. Sutherland had reason to question the veracity of Mr. Anthony's report that he had found prayer requests in the trash.[17] Plaintiff also claims that the reports were false because the prayer requests were stolen and then planted in the trash dumpsters. Discovery, however,

---

**16.** According to Defendants, Internal Data Management sent to individuals, who initially responded to Plaintiff's appearances on television, the "Prayer of Agreement Miracle Campaign" mailing or the "P–21" mailing. In the mailing, Plaintiff agreed to pray in agreement with the individuals for 21 days. The mailing contained three forms on which the individuals were asked to write prayers to Plaintiff for the 1st, 8th and 15th days. The "P–21B" and "P–21C" forms were for the 8th and 15th days.

**17.** As stated by the court in *Brueggemeyer,* the "First Amendment does not require that one who speaks on a public issue do so based only on inviable sources; instead the First Amendment inquires whether the sources are sufficiently perfidious to cause the publisher to believe the information is probably false or to prompt the publisher seriously to doubt the truth of what the source has revealed." 684 F.Supp. at 460. The Court concludes that a jury could not reasonably find, by clear and convincing evidence, that Defendants acted with actual malice in relying upon Mr. Anthony.

has failed to uncover any factual basis for the allegations that Defendants stole and planted the prayer requests in the trash dumpsters or in fact suspected that others stole and planted the prayer requests in the trash dumpsters. Plaintiff has no evidence to reasonably show that Defendants destroyed the still and video pictures claimed by Plaintiff. With an absence of affirmative evidence or specific facts to demonstrate that Defendants knew the alleged falsity of their statements in the challenged segments or entertained serious doubts as to those statements, the Court finds that Plaintiff's claim in regard to the statements cannot prevail.[18]

*PrimeTime II* also reported:

"ANNOUNCER: Eight months later, are his followers getting the full story?" (Followed by film clip of Plaintiff's videotape deposition in which he is shaking his head and saying "no.")

\* \* \* \* \* \*

"SAWYER: [voice-over] But four months later, here is Tilton in a videotaped deposition with the Texas attorney general's office, which they recently released to the press over Tilton's objection. In it, Tilton admits he doesn't really pray over every prayer request at all.

Rev. Tilton: [deposition] Not all of them are the original prayer request. Some are on a computer print-out with their specific kind of prayer that they want me to pray. So I don't get the actual document of some of them.

ATTORNEY: And what happens to the actual document?

Rev. Tilton: It's thrown away."

Plaintiff claims that the above-quoted statements in the *PrimeTime II* broadcasts were false and that Defendants acted with actual malice in publishing the statements. Upon review of the record, the Court finds an absence of evidence showing the statements were false. Indeed, the Court finds that the record supports the statements. The record reveals that Plaintiff admitted that he did not pray over all the prayer requests sent to him. Instead, he prayed over computer printouts with the requested prayer. The evidence also shows that Plaintiff did not tell his followers that he prayed over computer printouts. Even if there were evidence in the record to show falsity, the Court finds there is no evidence whatsoever to establish Defendants knew the alleged falsity of the statements or had serious doubts as to their truth.

*Phone Ministers*

■ *PrimeTime I* reported:

"SAWYER: [voice over] And if Hardy felt he was taking advantage of the callers, imagine how this woman felt, Elizabeth Montcalm, a temporary employee at AT & T. When Tilton went to Israel last year, *she and others at AT & T were asked to pose as Tilton prayer ministers.*

ELIZABETH MONTCALM: I got people calling about their sons being on drugs or alcoholics or husbands being an—an alcoholic. I mean, people are telling you their most intimate secrets, their personal stuff about themselves. And here I am, you know, just a temporary employee from AT & T."

Defendants, in support of their motion, contend they are entitled to summary judgment as to Plaintiff's challenge of the underlined statement "she and others at AT & T were asked to pose as Tilton prayer ministers." Defendants assert that their description of AT & T employees posing as prayer ministers was demonstrably true. Defendants assert that when Plaintiff broadcast from Israel in September 1990, he urged viewers to phone in their prayer requests to "prayer ministers" standing by at a "miracle prayer center" in Dallas. According to Defendants, Plaintiff instructed the temporary

18. Plaintiff, in his briefs, also challenges Defendants' reliance upon the statements of Brenda Reynolds, Plaintiff's housekeeper and nanny, in her interview with Defendant, Diane Sawyer. Plaintiff contends that Defendants knew Ms. Reynolds' statement "I know for a fact that he did not pray over them" could not be true because Defendants knew she was not with Plaintiff enough hours of the day or days of the week to know. However, the Court finds that Plaintiff has failed to sufficiently show that Defendants had any reason to doubt Ms. Reynolds' credibility or the truthfulness of her statements. Defendants knew that Ms. Reynolds was Plaintiff's housekeeper and nanny. Moreover, Ms. Reynolds specifically told Defendants that Plaintiff told her to "just take [the prayer requests] to the trash" and "[t]hrow them away."

AT & T workers, who had been retained to answer calls, to answer telephone calls by saying, "[t]hank you for calling *Success N Life* Ministry" and to tell "rambling" callers, "[y]our miracle will come as you pray with Pastor Bob the Prayer of Agreement." Ms. Montcalm, a temporary AT & T employee from Florida, told Defendants that when she was answering calls for *Success N Life* during the Israel crusade, callers told her intimate details of their lives, apparently believing that they were speaking to prayer ministers. From what was reported, Defendants contend that they believed their statement that AT & T temporary workers were asked to pose as prayer ministers was true.

In response, Plaintiff contends that the Ms. Montcalm and others at AT & T were never asked to pose as prayer ministers. Plaintiff states that the employees were simply hired to take overflow calls which came in during the Israel crusade. Plaintiff contends that the employees were instructed not to pray for anyone. Plaintiff further contends that during her interview, Ms. Montcalm never stated that she was asked to pose as a prayer minister.

Although Plaintiff has submitted evidence to support his contention that AT & T workers were not explicitly asked to pose as prayer ministers, the Court finds that Plaintiff has not submitted any evidence whatsoever to establish with convincing clarity that Defendants knew their statement in regard to the temporary AT & T employees was false or that they entertained serious doubts of the truth of their statement. Defendants knew prior to the broadcast that Plaintiff told his viewers during the crusade that their calls were being answered by "prayer ministers" at a "miracle prayer center." They also knew that AT & T temporary employees were instructed by Plaintiff to open each call by stating "[t]hank you for calling *Success N Life* Ministry, how may I help you?"; to take the caller's name, address, phone number and prayer request; and to respond to some callers by saying "your miracle will come as you pray with Pastor Bob the Prayer of Agreement." They further knew that callers were divulging intimate matters to the AT & T temporary employees. Plaintiff has made no showing that Defendants had information prior to the broadcast which would have cast

doubts on the truth of their statement. Therefore, Plaintiff's challenge to Defendants' statement must fail.

### Tilton's College Days

*PrimeTime I* and *PrimeTime II* reported:

"SAWYER: [voice-over] But an old buddy of Tilton's remembers how in college it was all a big joke.

FORMER TILTON FRIEND: Oh dear God! Come into this young woman's life! Heal tonight!

\* \* \* \* \* \*

FORMER TILTON FRIEND: Robert Tilton, as I knew him, was practicing to become a salesman. That was his concept of success, was to be—

SAWYER: [voice-over] This man, who wanted anonymity, is just one of several old friends of Robert Tilton who talked to us.

[RADIO MUSIC PLAYING]

RADIO ANNOUNCER: You're listening to XERF, the (INAUDIBLE) ...

SAWYER: [voice-over] He remembers when they were in college, they would use drugs or get drunk and go off to tent revivals as a kind of sport.

FORMER TILTON FRIEND: And we'd be drunk and go down front, fall to our knees, speak in tongues. [*PrimeTime I*: I think that anybody who was there would realize that some people are going to believe anything and all you have to do is capitalize on that belief.]

REV. MARVIN GORMAN: Loose him (INAUDIBLE) ...

SAWYER: [voice-over] Tilton and his friends started developing parodies, so-called "Jesus raps" of their own.

FORMER TILTON FRIEND: Oh, dear God! Come into this young woman's life! Heal tonight! She has a need to find Christ.

TILTON: O God! In the name of Jesus, we believe in prayer! We believe in miracles!

FORMER TILTON FRIEND: I personally thought I was a lot better at it than he was.

SAWYER: [voice-over] Tilton, who never finished college, admits he was a drug user, but says he was saved when some people came to his house and explained Christ.

TILTON: I just changed. I just fell in love with everybody!

SAWYER: [voice-over] But he never tells followers how he and his friends talked about running preacher scams and cashing in.

FORMER TILTON FRIEND: We said that when we graduated, that we would buy a good tent, a dynamite sound system, a good amen section, and fly around the country and get rich.

TILTON: We sold everything that we had, bought an old ragged tent and a big old truck and a travel trailer and we headed out to tell people about this gospel of Jesus."

In support of his motion and in response to Defendants' motion, Plaintiff contends that in both *PrimeTime I* and *PrimeTime II*, the statements of John Michael Taylor, "Tilton's former friend," together with Defendant, Diane Sawyer's surrounding comments and the context thereby created, portrayed Plaintiff as a man devoid of religiosity, who mocked the very thing for which he now stands. Plaintiff argues that Defendants' statements that while in college, Plaintiff participated in tent revival meetings as sport and in jest while drunk, joked with friends by practicing so-called "Jesus raps" and religious parodies, and hatched a plan to get rich by engaging in a revival preaching scam, were lies and were broadcast with actual malice. Plaintiff argues that in broadcasting these statements, Defendants relied on their interview with John Michael Taylor. However, according to Plaintiff, Mr. Taylor stated, in that interview, that he could not say if Plaintiff actually did what Defendants stated he did in the broadcasts. Plaintiff states that the tent revival disgrace referred to by Mr. Taylor was a fad fueled by a movie entitled "Elmer Gantry." It occurred in 1963 at North Texas State University and involved John Michael Taylor and two of his friends Doug McLeod and Michael Harbison. Plaintiff asserts that he never attended North Texas State University. Moreover, Plaintiffs asserts that Doug McLeod has testified that he never knew Plaintiff and Michael Harbison has testified that he never remembered Plaintiff participating in the revival sport.

Plaintiff also asserts that ABC's raw footage videotape of Mr. Taylor's interview shows that Mr. Taylor, in speaking of the fad, used the pronoun "we" to refer to a coterie of college friends, which did not include Plaintiff, and used the pronoun "he" to refer to Plaintiff. Plaintiff thus contends that the statements "[a]nd we'd be drunk and go down front, fall to our knees, speak in tongues" did not include Plaintiff as was represented by the broadcast.

In addition, Plaintiff asserts that the broadcasts showed Mr. Taylor stating "[w]e said that when we graduated, that we would buy a good tent, a dynamite sound system, a good amen section and fly around the country and get rich." ABC's raw footage videotape, however, shows that Mr. Taylor stated "I said" rather "we said." Plaintiff argues that Defendants purposely edited Mr. Taylor's statement "I" to become "we" to include Plaintiff making that statement. According to Plaintiff, Defendants knew that statement was false and their own executive producer, Richard Kaplan, admitted that such a change was not a proper editing practice.

Plaintiff further asserts that Defendant, Diane Sawyer, stated in the broadcasts that Plaintiff made up "Jesus raps." ABC's raw footage, however, shows that Mr. Taylor never used the phrase "Jesus raps" when describing his mockery of revival preachers. Plaintiff contends that he never conducted any "Jesus raps" with Mr. Taylor or anyone else.

Plaintiff further contends that after *PrimeTime I* aired, he stated on his *Success N Life* program that Mr. Taylor's statements were a lie. In spite of Plaintiff's statements, which were provided to Defendants, and their own raw footage, Defendants rebroadcast the segment.

Defendants, in response and in support of their summary judgment motion, argue that despite Plaintiff's statements, they had a sufficient basis for believing that Plaintiff mocked preachers and attended tent revival meetings during his college days as a kind of

sport. Defendants contend that Mr. Taylor, in the interview, did say that Plaintiff imitated preachers and that he was present on more than one occasion at tent revival meetings. Defendants also contend that Mr. Taylor indicated that Plaintiff participated in and was in agreement with discussions of a becoming a revival preacher in order to get rich. Although Mr. Taylor used "I said" instead of "we said" in part of the interview when referring to becoming a revival preacher to get rich, he later used "we said" when referring to that same topic. Defendants state that the edit change to "we said" was for clarity reasons and did not alter the meaning of the statements in any way. Defendants further contend that even though Plaintiff did not attend North Texas State University with Mr. Taylor in 1963, Defendants state that he did subsequently attend Cooke County Junior College with Mr. Taylor. Mr. Harbison also attended Cooke County Junior College during that time and was acquainted with Plaintiff.

As to the issue of actual malice, Defendants argue that Plaintiff cannot show with clear and convincing evidence that Defendants broadcast Mr. Taylor's statements knowing they were false or with serious doubts as to their truth. Defendants contend that Defendant, Robbie Gordon, who conducted the interview, confirmed Mr. Taylor's recollections with others and she independently verified the facts related to her by Mr. Taylor. According to Defendants, Ms. Gordon believed what Mr. Taylor had told her and had no reason to doubt his statements.

■ Having reviewed the evidence, the Court finds that Plaintiff has failed to present sufficient evidence to raise a genuine issue of fact that Defendants knew the falsity of the statements made in the broadcast or had serious doubts as to the truth of the statements. Although Plaintiff states that ABC's raw footage shows that Mr. Taylor did not actually say that Plaintiff went down front at tent revival meetings, fell on his knees and spoke in tongues, it is clear from the interview that Mr. Taylor stated that Plaintiff was present at the tent revival meet-

ings and was a part of the group that was involved in such behavior. Indeed, Mr. Taylor stated:

"It's been so long ago that I, I can't recall the specific time and place him there to swear to it. *I can say that it took place more than one time. That it was in the behavior pattern of the group that we ran with. That it was known to all of us. That it happened and was talked about. And that he was present, and he was in that group.* Whether or not he actually went down to the front, and fell on his knees, and quaked, and spoke in tongues, I cannot say. *But he was running with the group that did, and that made fun of the preachers, and that held that kind of behavior in high contempt.*"

(Joyce 2nd Aff., Ex. 5 at p. 6). (Emphasis added).

■ As to "Jesus raps," it is true that Mr. Taylor did not use that phrase in referring to parodies that were performed at parties. Notwithstanding the editorializing of Defendants, the evidence does reveal that Mr. Taylor did tell Defendants that he and Plaintiff performed parodies involving preaching.[19] Mr. Taylor specifically stated:

We had a parody that we would drop into at parties, of preaching. And we would emulate revival preachers that we had heard on the air at parties, and, and everyone would praise the Lord and fall on their knees, . . . . *And he was there, yes, he was there.*

\* \* \* \* \* \*

*Tilton, trying to emulate the preachers at the time was—I'm sure that he—we all tried to throw a pitch at one time or another.* It was just part of our standard pattern, our repartee. We would throw it back and forth. Everyone would attempt it. I personally thought I was a lot better at it than he was.

\* \* \* \* \* \*

*When we were at—when we were at parties and we would get into our preacher mode, all of us would throw lines back and*

---

**19.** With regard to the "Jesus raps" characterization, the Court relegates this to an editorialization and finds it represents a non-actionable

opinion. *See, e.g., Metcalf,* 828 F.Supp. at 1529–1532; *Miskovsky,* 654 P.2d at 593.

*forth.* It was like a group of comedians standing around and throwing lines back and forth to one another. *There was nobody that wasn't included. We all took part in this.* I mean, everyone had their own little special part of it. And we played off of one another. It, it truly was like a bunch of stand up comedians, trying to work out a routine.

(Joyce 2d Aff., Ex. 5 at pp. 5, 7, & 8). (Emphasis added). Given these statements, Plaintiff cannot show that Defendants knew it was false in stating that Plaintiff had developed parodies.[20]

■ In regard to the "I/We" change, the Court finds that such editing change does not establish actual malice. An edited or altered quotation is not sufficient to establish actual malice "unless the alteration results in a material change in the meaning conveyed in the statement." *Masson*, 501 U.S. at 517, 111 S.Ct. at 2433. In the instant case, the edited change to "we said" did not materially change the meaning conveyed by Mr. Taylor. During the interview, Mr. Taylor, in response to Ms. Gordon's question about joking with Plaintiff, did state:

> We said if we didn't, if, after we graduated that we had a hard time making a living, or if we weren't making the kind of money that we wanted to, that what we should do, would be to grab an audience, become a revival preacher. And through that means we'd be able to be rich.

(Joyce 2nd Aff., Ex. 5 at p. 6).

The meaning conveyed by Mr. Taylor in the interview was that he and Plaintiff used to joke about becoming revival preachers to get rich. The alteration of the "I" to "we" did not change the meaning which had been conveyed by Mr. Taylor. Although Plaintiff contends that Mr. Taylor was not referring to Plaintiff when using "we," the Court finds that no reasonable jury would find that Mr. Taylor did not include Plaintiff when referring to "we" and no reasonable jury would find by clear and convincing evidence that Defendants acted with actual malice in making the edited change.

---

**20.** The Court also notes Plaintiff has not presented any evidence to show that Defendants had any reason to doubt the credibility of John Michael Taylor or the truthfulness of his statements.

## Tilton's Start

■ *PrimeTime I* and *PrimeTime II* reported:

> "SAWYER: And by 1981, [Tilton] had hit the big time? How? *PrimeTime* has learned that for several years, Tilton courted a man news accounts have tied to organized crime and drug smuggling, Herman Beebe, a financier whose banks gave Tilton a $1.3 million loan, though Tilton claims he never met the man. And after Tilton got money, he got a new image, too—a permanent wave for his hair, plastic surgery and, like his good buddy, Jim Bakker, a talent for tears on demand."

In their motion, Defendants assert that they are entitled to summary judgment in regard to Plaintiff's challenge of the above-quoted segments. They contend that there is no evidence to suggest they did not believe the accuracy of their statements. Defendants state that they conducted an extensive investigation of the relationship between Plaintiff and Herman Beebe, which Plaintiff has conceded. Through that investigation, they learned that Plaintiff had obtained a $1.3 million loan from Herman Beebe's bank in 1980, that press accounts as far back as 1976 linked Herman Beebe to organized crime and that Plaintiff's spokeswoman was quoted in the *Dallas Morning News* as saying Plaintiff did not know Herman Beebe. Defendants also state that their report, contrary to Plaintiff's claim, did not imply that Plaintiff was linked to drug smuggling and organized crime. As to the term "courted," Defendants contend that it was an editorial characterization of Plaintiff's efforts to obtain a loan and was accurate based upon the facts. Defendants further argue that the term is not actionable and it is a constitutionally protected opinion. In regard to the other statements, Defendants contend that the evidence establishes the truth of the statements. Although Plaintiff claims Defendants conveyed that the loan proceeds received from Mr. Beebe were used to pay for his permanent wave and plastic surgery, Defendants state that no such fact was conveyed by the report. Defendants explain that the broad-

casts only stated that the permanent wave and the plastic surgery were obtained after the loan was received. The evidence, they argue, supports such facts. Defendants further state that the evidence shows that Jim Bakker was a friend of Plaintiff and that Plaintiff could cry on demand. Plaintiff, in response, contends that there is no evidence to support Defendants' contention that they reviewed the 1976 news article purportedly linking Herman Beebe to organized crime prior to the broadcasts. Moreover, Plaintiff contends that the article does not support their statement that Herman Beebe had links to organized crime. Plaintiff asserts that the article merely states he had associations with individuals who have organized crime connections. In addition, Plaintiff states that the statement in the report that Plaintiff "courted" Herman Beebe is false and not a protected opinion. Plaintiff concedes that he met Herman Beebe and that Mr. Beebe agreed to loan the Church money at their first meeting. However, he states that Mr. Beebe referred him to Dallas–Fort Worth Airport Bank. Plaintiff admits that he called Dale Anderson, an associate of Mr. Beebe, about the loan approximately three times but states he also referred Plaintiff to the bank. Plaintiff thereafter called the bank's president numerous times to obtain the loan. Plaintiff additionally states that the evidence shows that the segments of the broadcast falsely implied that Plaintiff hit the big time as a result of the loan. Plaintiff states that by 1981, he and his Church were in debt and were incurring more debt. Plaintiff states that the Church had to pay the Beebe loan with other loans, which resulted in further debt. He admits that the article in the *Dallas Morning News* stated that "Tilton declined to be interviewed, but said through a spokeswoman that he never met Beebe," but states that Defendants' statement that "though Tilton claims to have never met the man" is false. Furthermore, Plaintiff states that Defendants' report falsely implied that he obtain a permanent wave and plastic surgery from the Beebe loan.

According to Plaintiff, the permanent wave and the plastic surgery were obtained in 1989. As to Jim Bakker, Plaintiff states that he knew Jim Bakker only as a minister and not as a good friend. Plaintiff also contends that Defendant, Robbie Gordon's credibility is at issue in regard to the statement that Plaintiff can cry on demand.

The Court, having reviewed the evidence pertinent to the challenged segment, finds that Plaintiff has failed to present sufficient evidence to raise a question of fact that Defendants knew the challenged segments were false or that Defendants subjectively entertained serious doubts as to their truth. Despite Plaintiff's contention, the evidence does reflect that Defendant, Robbie Gordon, reviewed the 1976 news article concerning Herman Beebe.[21] Although the report did not specifically state that Herman Beebe was linked to organized crime, it did state that Herman Beebe had associations with persons involved in organized crime. The evidence also shows that Ms. Gordon discussed the article with the author prior to the initial broadcast. As to "courting," the evidence shows that Ms. Gordon, in her investigation, was told that Plaintiff sought out Herman Beebe to obtain a loan. According to Ms. Gordon's affidavit, the inception of the relationship between Herman Beebe was described by Mr. Beebe's associate as "courting."[22] Ms. Gordon also reviewed prior to the initial broadcast, the *Dallas Morning News* article which quoted Plaintiff's spokeswoman as saying that Plaintiff did not know Herman Beebe. Plaintiff has not shown any evidence to establish that Defendants knew the statement "though Tilton claims never to have met the man" was false. Moreover, Plaintiff has not shown any evidence that Defendants knew that Plaintiff incurred more debt after receiving the Beebe loan and he has not shown that Defendants knew that Jim Bakker was not a good friend of Plaintiff. Furthermore, even if Ms. Gordon's testimony were discredited, Plaintiff has failed

**21.** Plaintiff's objection as to the admissibility of the news article on the basis that it had not been produced to him is without merit. It appears that the news article was produced to Plaintiff during the preliminary injunction hearing and it was admitted into evidence.

**22.** In any event, the Court finds that the term "courted" fits the facts as it is defined in *Random House Dictionary of the English Language* 464 (2nd ed. 1987) as "to try to win the favor, preference, or goodwill of."

to present any affirmative evidence to show Defendants knew their statement that Plaintiff had a talent for tears on demand was false. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514 (discredited testimony not normally considered a sufficient basis for drawing a contrary conclusion; plaintiff must present affirmative evidence in order to defeat properly supported summary judgment motion).

Finally, Plaintiff has failed to present sufficient evidence to establish an issue of fact that Defendants intended the alleged false implications that Plaintiff was connected to organized crime and drug smuggling, and Plaintiff paid for his permanent wave and plastic surgery from the loan proceeds received from Herman Beebe.

### Tilton's Lavish Lifestyles

█ *PrimeTime I* reported:

"SAWYER: [voice-over] ... But could this be the "parsonage," in swank Rancho Santa Fe, California, a four point five million lake view home.... Or is this the parsonage, in Fort Lauderdale, Florida....

*PrimeTime II* also reported:

SAWYER: [voice-over] ... But could this be the "parsonage," in swank Rancho Santa Fe, California, a multi-million dollar lake view home.... Or is this the parsonage, in Fort Lauderdale, Florida...."

In their motion, Defendants contend that they are entitled to summary judgment in regard to Plaintiff's challenge to the above-quoted segments. Defendants state that the gist of the challenged segments was not, as Plaintiff claims, that Plaintiff lived in more than one house at a time but rather that unbeknownst to—and in stark contrast to—his "poor and hurting" followers, he lived lavishly in "parsonages" that were hardly modest homes which the word conveys. According to Defendants, whether or not Plaintiff lived in more than one home at a time, or instead moved about from one to another does not affect the truth of the gist of their report. Defendants also state that the segments in regard to Plaintiff's houses was meant to describe Plaintiff's style of living which was quite lavish and to raise with viewers the question of whether the homes in which Plaintiff reside while pastor of his Church reflected his—or their—idea of a parsonage. As to Plaintiff's challenge regarding the Florida residence, Defendants state that the broadcasts accurately reported that bank records reflected Plaintiff, not the Church, as the owner.

Plaintiff, in response, contends that Defendants' parsonage segments were false in that they implied that Plaintiff was a liar because he possessed more than one parsonage as represented in his Church magazine. Plaintiff contends that at the time of the broadcasts, he no longer resided at the house in Rancho Santa Fe, California, and the residence in Fort Lauderdale, Florida was personally owned by Plaintiff and his wife rather than the Church. According to Plaintiff, Defendants acted with actual malice because Defendants knew Plaintiff only had one parsonage at a time; they knew he was living in a leased house on Krohn Court while the Church's new parsonage in Los Colinas was being remodeled; they knew he no longer resided at the house in Rancho Santa Fe, California; and they knew the Florida residence was owned by he and his wife personally.

The Court, upon review of the challenged segment and the record thereof, finds that Plaintiff has failed to raise a genuine issue of fact, even under the preponderance of the evidence standard, as to falsity of the segments and has failed to raise a genuine issue of fact as to actual malice on the part of Defendants. The Court finds that no reasonable jury would conclude the broadcasts at issue stated that Plaintiff owned four parsonages at one time. It is clear the challenged segments were only raising questions as to whether the residences were "parsonages." There is no dispute that Plaintiff lived at one time in all three of the residences shown on the broadcasts and that the Church maintained those residences as "parsonages." With respect to the Florida residence, the broadcasts did accurately reflect that Plaintiff was the owner. Although Plaintiff contends that the broadcasts imply that he was a liar because he had four parsonages when he only reported one in the Church magazine, the Court finds that Plaintiff has failed to show that Defendants intended or knew the

false implication of the broadcasts. *Saenz,* 841 F.2d at 1318 (to show actual malice, a plaintiff must prove "with clear and convincing evidence that the defendants intended or knew of the implications" he alleges).

■ *PrimeTime I* and *PrimeTime II* also reported:

"SAWYER: [voice-over] He also tells followers he'll pray for their miracles, so they should send him money.

SAWYER: [voice-over] Like Jesus? The Bible says Jesus went to fast and separate himself from worldly things. Pastor Bob flew first class to a posh ski resort in Colorado, three suitcases for five days, a room with a fireplace—he even brought his own television along—while asking followers to send money."

Plaintiff challenges this report in the broadcasts on the basis that it states that Plaintiff will pray for his followers' miracles if they send money, that it states that he stayed in a "posh" ski resort in Colorado and that it implies the Colorado trip was a fundraising campaign. Defendants, in support of their summary judgment motion, contend that their statements were true. Defendants contend that the evidence shows Plaintiff repeatedly appealed to his followers for funds. Defendants state that Plaintiff in one appeal specifically asked his followers to "carefully write down the areas of your life (especially financial) where you want me to release my anointing on your behalf . . . and then write a check for the best possible gift that you can give!!!" (Gordon Aff., para. 19). With respect to his trip to Colorado, Defendants contend that Plaintiff undisputedly encouraged viewers to pay vows and the broadcasts repeatedly referenced the payment of vows. As to the "posh" reference, Defendants contend that it is not actionable as it is a constitutionally protected opinion.

The Court, having reviewed the submitted evidence, finds that Plaintiff has failed to present sufficient proof, even under a preponderance of the evidence standard, to show Defendants' statements were false. The evidence shows that Plaintiff, in his mailings,

did ask his followers to write a check at the same time he asked for them to write down their prayer request. In addition, Plaintiff has admitted that he encouraged viewers to pay vows during the broadcasts in Colorado and the broadcasts referenced the payment of vows, tithes and offerings.[23]

The Court further finds that Plaintiff has failed to offer any evidence whatsoever which establishes with convincing clarity that Defendants knew of the falsity of their statements or that they had serious doubts as to the truth of those statements.

*Guatemala*

■ *PrimeTime II* reported:

"SAWYER: . . . And what about something else Tilton said in his deposition? He claims that his contribution to his mission in Guatemala is 100 percent of their needs.

ATTORNEY: —that you were going to provide—

PLAINTIFF: We would be—

ATTORNEY: —100 percent of the support that they need to maintain their operation.

PLAINTIFF: Yes, yes.

SAWYER: So we checked this out. We spoke to the onsite missionary in Guatemala who told us, in fact, Tilton is only a *partial sponsor.*"

In his motion and in response to Defendants' motion, Plaintiff asserts that the statement that Plaintiff "claims that his contribution to his mission in Guatemala is 100 percent of their needs" misstates Plaintiff's deposition testimony. Plaintiff states that it was his original understanding that he would underwrite 100 percent of the expenses of the Guatemalan mission's ten schools and its mobile clinic, but that he did not mind if others gave additional funds. He also states that he explained in his deposition that even *with intentions of full support of foreign missions,* nominal donations were often received from other sources. Plaintiff further states that Hugo Morales, the Guatemalan mission-

---

**23.** In regard to Defendants' use of "posh" to describe the Colorado ski resort, the Court finds the statement is not actionable. The Court finds no reasonable viewer or listener would interpret the statement as anything other than an expression of opinion. It is an evaluative characterization, not susceptible to proof of its truth or falsity. *See, e.g. Metcalf,* 828 F.Supp. at 1529–1532.

ary, testified that Plaintiff undertook to support the schools and the mobile clinic and supported those activities 100 percent.

Plaintiff contends that Defendants knew their statements in the above-quoted segment were untrue. According to Plaintiff, Defendants knew the meaning and content of Plaintiff's deposition testimony. They also possessed Church documents, including a copy of the monthly support check and a note on Guatemala School Support documenting Tilton's contribution of $12,200 a month to the Guatemala mission. Plaintiff states that Defendants also possessed audio tapes and notes of two phone calls to Mr. Morales showing that Mr. Morales' first response to questioning concerning Plaintiff's support was that Plaintiff financed the mission and its schools totally.

Defendants, in response and in support of their motion, contend that Plaintiff did say in his deposition that he provided 100% of the support for the Guatemalan mission. Defendants state that they spoke with Mr. Morales before the air of *PrimeTime II* and he told them that he received funding from Plaintiff through the Don Stewart Association; that he received approximately $12,000 a month from the Don Stewart Association; and that he did not know how much of that amount came from Plaintiff. Defendants also state that Mr. Morales told them that the money received from the Don Stewart Association paid for the mission's expenses and only 50% of the teachers' salaries for his 12 schools. In addition, Defendants state that discovery has confirmed that Mr. Morales receives an additional $2,200 a month which does not come from Plaintiff.

Having reviewed the evidence applicable to the challenged segment, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to whether Defendants had knowledge of the alleged falsity of the challenged statements or had serious doubts of the truth of those statements. Plaintiff has not presented any evidence to suggest that Defendants did not believe the statements of Mr. Morales that he received funding from Plaintiff through the Don Stewart Association; that he did not know how much of that amount came from Plaintiff and that the money received from the Don Stewart Association paid only 50% of the teachers' salaries

for his 12 schools. Even if Ms. Sutherland's credibility were at issue and her testimony were discredited, Plaintiff has also not submitted affirmative evidence to satisfy his burden of proof in regard to the issue of actual malice. *Anderson,* 477 U.S. at 256–257, 106 S.Ct. at 2514.

■ In regard to Guatemala, *PrimeTime II* also reported:

"SAWYER: And the Guatemalan government has gone public to say that Tilton and his promotional material exaggerate his contribution for personal gain, including his claim of a special invitation.

PLAINTIFF: [television broadcast] I've been invited to be in the inauguration, the ball, all the celebrations and—

SAWYER: That's not true, according to the president's spokesman, Fernando Muniz.

FERNANDO MUNIZ: [through interpreter] No. That the president has invited him to attend the inauguration is by all means false, nor does he have any relation with the government. But we cannot take action against a swindler of this caliber."

In their motion, Defendants contend that they are entitled to summary judgment in regard to Plaintiff's challenge of the above-quoted segment. Defendants contend that Fernando Muniz confirmed in his deposition that he was the official spokesman for the president of Guatemala, that the president did not know who Plaintiff was and that neither the president nor his government invited Plaintiff to the inauguration. According to Defendants, Mr. Muniz explained that Plaintiff may have received an invitation from an evangelical church in Guatemala, but even if he had, it would not have been an invitation from the government. Based upon Mr. Muniz's testimony, Defendants contend their statement that Plaintiff was not invited to the inauguration by the president of Guatemala was true.

Plaintiff, in response, argues that Defendants' statement that he was not invited to the inauguration was false. Plaintiff contends that he did receive an official invitation to the inauguration ceremony. He states that the invitation came from Harold Ca-

balleros, who had obtained the invitation from one of the five groups that had given out invitations to the ceremony in addition to the president and congress of Guatemala. According to Plaintiff, he never claimed that the president invited him to the inauguration or that the president was his friend. Plaintiff maintains that the Church magazine article at issue, which Defendants had a copy of prior to the broadcast, only stated the "government" was so appreciative of Robert Tilton Ministries' contribution to the Guatemalan people that it sent an official invitation to Plaintiff. Plaintiff contends that Defendants' interview with Mr. Muniz solely focused on whether the president invited Plaintiff, whether he knew Plaintiff's work personally and whether he appreciated Plaintiff's work. Plaintiff further states that Mr. Muniz indicated to Defendants in the interview that it was probable that some international official of the president's party may have begun a relationship with Plaintiff.

The Court, upon review of the evidentiary materials, finds that even under the preponderance of the evidence standard, Plaintiff has not raised a genuine issue of fact as to the falsity of the report. Irrespective of the fact that the Church magazine article reported the government had invited Plaintiff and not the president, Plaintiff has failed to dispute the fact that he did not receive an invitation by either the government or the president. The evidence merely shows that he received an invitation from a religious minister. That minister, as Mr. Muniz testified and Plaintiff has not disputed, was not a part of the Guatemalan government.

In addition, the Court finds that Plaintiff has not presented sufficient evidence to raise a genuine issue of fact as to whether Defendants knew the challenged segment was false or had serious doubts as to its truth. Although Plaintiff suggests that Defendants' possession of the magazine article which stated that the "government" had invited him and their decision to focus solely on whether an invitation was received from the Guatemalan president shows actual malice, the Court finds that such facts do not support a finding with convincing clarity that Defendants knew or were aware their statements in the broadcast were false.

### India Crusade

■ *PrimeTime II* reported the following:

"SAWYER: [voice-over] And something else about Tilton the missionary. Repeatedly, he tells his viewers that their donations enable him to win souls around the world.

TILTON: [television broadcast] And we totally—Word of Faith Ministries, you the Family Church, underwrites totally this particular evangelism unit.

SAWYER: [voice over] Tilton tells followers they finance crusades in countries too poor to pay themselves.

INDIAN TRANSLATOR: [Speaking Tamil]

DAN MORALES: He's come all the way from America!

SAWYER: [voice-over] So PT decided to follow Robert Tilton to India this past March.

TILTON: Do you want to please God tonight?

INDIAN TRANSLATOR: [Speaking Tamil]

SAWYER: [voice-over] Well, there was Tilton, passing the collection plates nightly.

[Visual of Tilton preaching, then a woman taking up an offering while Tilton was preaching, and then Tilton preaching] If each of these people gave just a few pennies, Tilton would get back hundreds of thousands of dollars—

TILTON: . . . Hallelujah!

CONGREGATION: [Yelling in Tamil] . . . Hallelujah!

SAWYER: [voice-over]—money taken from the people he himself calls 'the poorest people on earth.'

INDIAN MAN: [through interpreter] Tilton said, 'Please donate money. Please donate money,' so everybody got disappointed and then everybody whispered, 'This is not a crusade, it's a business.'"

In his motion and in response to Defendants' motion, Plaintiff claims Defendants falsely stated that he passed collection plates during the crusade in India. According to Plaintiff, ABC's cameraman's dope sheet for

the taping of the India crusade, which provides the time sequence of the contents of the tapes, shows that the offering was actually taken up by a lady worker with a green bag. Plaintiff states that the offering was taken up at the request of Jack Harris, the coordinator for the India Crusade, before Plaintiff arrived to preach. Plaintiff also asserts that ABC's raw footage of Plaintiff shows that he did not pass a collection basket and was not present when the collection plates were passed among the crowd. He claims that ABC's raw footage instead shows another person preaching as the offering was taken by the lady worker. Moreover, Plaintiff asserts that the offering was not taken up for Plaintiff and his Church. Rather, it was taken up for the benefit of local pastors in India.

Plaintiff contends that Defendants had full knowledge of their own raw footage and cameraman's dope sheets and were therefore aware that no collection was taken while Plaintiff was present, as portrayed by the broadcasts. Plaintiff argues that Defendants had no evidence that any collection of money was taken up by Plaintiff and Defendants had no evidence that any of the money collected went to Plaintiff. Plaintiff argues that Defendants' editing of the broadcast videotape to include Plaintiff's voice while the woman was passing the collection basket as well as Defendants' failure to investigate obvious sources who would have had knowledge of what happened in India demonstrates Defendants acted with actual malice.

Defendants, in response and in support of their summary judgment motion, argue that the evidence fails to establish that Defendants knew the alleged falsity of the report or had serious doubt about its truth. Defendants contend that they obtained their information about the India crusade from J.N. Sharma, an Indian journalist who covered the India crusade as an independent contractor for ABC News Intercontinental, Inc. According to Defendants, Mr. Sharma reported that he had personally attended Plaintiff's crusade, advertised in Madras as the Robert Tilton India Crusade. Mr. Sharma also reported that he personally observed Mr. Harris, a person whom he understood to be a representative of Plaintiff, ask the crowd at the crusade to donate money. Mr. Sharma reported that he observed Plaintiff on stage while the collection was taken up and observed many people contributing. According to Defendants, Mr. Sharma sent taped interviews of individuals who had been present at the India crusade. One of those interviewed stated that Plaintiff had asked for the money and another stated that the followers of Plaintiff had begged for money.

In regard to Defendant, Diane Sawyer's statement that "if each of these people gave just a few pennies, Tilton would get back hundreds of thousands of dollars, money taken from the people he himself calls 'the poorest people on earth,'" Defendants argue that Plaintiff cannot dispute that the crowds attending were poor and that money was collected from them. Defendants also state that Plaintiff cannot dispute that if each of the people had given just a few pennies that hundreds of thousands of dollars would have been collected. Defendants assert that the statement does not remark as to what was to be done with the funds after they were collected. According to Defendants, the gist of the report was that Robert Tilton India Crusade took collections from the masses of the desperately poor who attended the crusade.

Upon review of the record, the Court finds that Plaintiff has failed to submit sufficient evidence to raise a genuine issue of fact as to whether Defendants knew the alleged libelous statements were false or had serious doubts as to their truth. Plaintiff's only evidence in support of actual malice is that ABC's raw footage did not have a picture of Plaintiff on stage during the collection of the offering, that the footage was edited to show Plaintiff preaching when the collection basket was passed and Plaintiff's and other persons' testimony that Plaintiff was not on stage. Such evidence, however, does not establish with convincing clarity that Defendants knew the alleged falsity of the statements or had serious doubts as to the truth of these statements. Plaintiff has failed to offer any evidence to dispute the evidence that Mr. Sharma reported to Defendants that Plaintiff was on stage at the time the offering was collected and that he sent Defendants taped interviews with persons attending the India crusade stating Plaintiff or his followers collect-

ed an offering.[24] Moreover, Plaintiff has failed to dispute that the crusade was the Robert Tilton India crusade and that offerings were collected during the crusade. Plaintiff has argued that if Defendants had interviewed Jack Harris and Reverend Dayanandhan, the assistant coordinator of the India crusade, they would have discovered the truth of the statements. However, a failure to investigate is not sufficient to establish actual malice. *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326.

In his briefing, Plaintiff asserts that Mr. Sharma was acting within the scope of his employment with ABC and therefore actual malice can be imputed to ABC. The Court, however, disagrees. Plaintiff, in support of his assertion, relies upon Mr. Sharma's affidavit. Yet the affidavit does not establish Mr. Sharma was an employee of ABC or was acting within his employment when reporting on the India crusade. Indeed, the affidavit as well as the contract attached thereto indicates that Mr. Sharma was an independent contractor for ABC. Plaintiff has not presented any evidence to show to the contrary. Therefore, the Court finds Plaintiff's assertion not compelling.[25]

### Other Missions

■ In *PrimeTime II*, Defendants reported (while showing names of five of missions):

> "SAWYER: And Tilton creates the impression that after he pays for his overhead and all that expensive air time, the money goes to good works like these his missions around the world. But we tracked down every charitable contribution of Tilton and we calculate he spends more in a year on billboards around Dallas than he does on all these missions combined."

Defendants, in their motion, contend that summary judgment is appropriate as the statements made in the above-quoted segment were true. Defendants assert that, during their investigation, they attempted to obtain information from the Church in regard to its missions, but the Church denied

access to any information. Defendants contend the above-quoted segment of *Prime-Time II* was based upon the information they were able to gather from their investigation. According to that investigation, $180,000 per year was spent on billboards and $150,000 on missions. In addition, Defendants state that discovery has revealed that in 1991 Plaintiff spent $325,000 on leasing billboards and gave $177,272 to the five missions. Defendants thus argue that Plaintiff cannot establish falsity of the segment. Furthermore, Defendants argue that Plaintiff cannot establish actual malice in regard to the segment as Plaintiff has no evidence to show Defendants deliberately selected missions which received less contributions and has not shown that they had knowledge of the alleged falsity of their report or serious doubts as to the truth of the broadcast.

In response, Plaintiff concedes that the Church spent more on billboards than the five missions shown on the broadcast. However, Plaintiff contends that the gist of the report was to accuse Plaintiff of misleading his followers concerning support of missions and denigrate the amount of his support. Plaintiff asserts that Defendants knew the gist was false.

Even if the Court were to apply the preponderance of the evidence standard to the issue of falsity, the Court finds that Plaintiff has failed to raise a genuine issue of material fact that the challenged segment or the gist of that segment was false. In regard to the issue of actual malice, the Court finds that Plaintiff has failed to present any proof with convincing clarity to raise a genuine issue of fact that Defendants knew the alleged falsity of the statements or that they published the statements with a high degree of awareness of the probable falsity.

*PrimeTime II* also reported:

> "SAWYER: [voice over] Also after our broadcast, Tilton attacked us for what we said about his missions, the ones he implies

---

**24.** Plaintiff argues, in his response to Defendants' motion, that Mr. Sharma's credibility is at issue. However, Plaintiff has failed to show that Defendants had reason to doubt Mr. Sharma's credibility or the veracity of Mr. Sharma's reporting.

**25.** Even if the evidence were adequate to establish Mr. Sharma was an employee of ABC, the Court finds that Plaintiff has failed to proffer sufficient evidence to show that Mr. Sharma knew what he reported was false or that he had serious doubts as to the truth of the report.

are his own, like this one. Here's how he promotes it on his TV show.

ANNOUNCER: And Wings of Mercy, a center sponsored by Robert Tilton Ministries—

SAWYER: [voice-over] The promotion makes you think it is Tilton's center, but listen to his deposition.

ATTORNEY: Know what Wings of Mercy is?

PLAINTIFF: Not really.

SAWYER: No wonder, since Prime-Time has learned that Tilton's contribution to that mission is just $300 a month."

In his motion and in response to Defendants' motion, Plaintiff contends that Defendants knowingly created a context in their broadcast whereby the viewer would understand that Plaintiff's contribution to his missions, such as Wings of Mercy, was "meager, paltry and insignificant." Plaintiff claims that he did contribute $300 a month to the Wings of Mercy shelter and that this amount was the amount needed by the shelter. Plaintiff contends that he provided support to the mission when no one else would. Thus, his contribution was not negligible as the broadcast implied.

Defendants, in response and in support of their motion, contend that their broadcast was true. Defendants state that it is undisputed Plaintiff did promote on his television program that Wings of Mercy was a center sponsored by Robert Tilton Ministries; that his contribution was only $300 per month and that he did not recall in his deposition what Wings of Mercy was. Defendants state they believed the information to be true.

Having reviewed the challenged segment and the evidence related thereto, the Court finds that Plaintiff has failed to raise a genuine issue, under a preponderance of the evidence standard of proof, that the broadcast was false. Moreover, the Court finds that Plaintiff has failed to raise a genuine issue of fact as to whether Defendants knew the report was false as alleged or entertained serious doubts as to the truth of the broadcast.

### Additional Incidents of Alleged Actual Malice

■ The last three paragraphs of Plaintiff's statement of material facts in his partial summary judgment motion set forth facts addressing the issue of "malice." The first paragraph refers to a July 1992 newspaper article purporting to quote Defendant, Diane Sawyer, as saying "[w]hen I saw Tilton on TV and what he was doing, I was appalled,.... He needs to be stopped." The second paragraph refers to affidavit testimony from Plaintiff that prior to *PrimeTime I*, he directed the Church's attorney to respond to Defendant, Kelly Sutherland's request for an interview and decline such an interview; that at his direction, the Church offered to review any broadcast to inform *PrimeTime Live* of errors, if any, and to furnish any documents necessary to prove the errors; that at his direction, the Church advised *PrimeTime Live* that the Church would enter into a contract with *PrimeTime Live* that the Church would not seek in any manner prior restraint of the planned broadcast if allowed to review the broadcast; but that ABC would not allow the Church to know the planned content of the broadcast to correct errors, if any. The third and final paragraph refers to handwritten notes of Defendant, Kelly Sutherland, taken during a telephone conversation with Defendant, Robbie Gordon, which state "no fraud to be had on this guy— can have fun with him though."

Defendants responded to Plaintiff's statement of facts believing the paragraphs pertained to the issue of actual malice. Defendants addressed each of the paragraphs and argued that none of the facts stated proved actual malice. In reply to Defendants' response, Plaintiff states that the paragraphs have nothing to do with knowledge of falsity or publication with reckless disregard as to truth or falsity. He states they are concerned with malice, which is a prerequisite for punitive damages under Oklahoma law. Nonetheless, Plaintiff goes on to state that "evidence of ill will or ulterior motive, 'malice,' can bolster the inference of "actual malice," citing to *Harte–Hanks,* 491 U.S. at 668, 109 S.Ct. at 2686 ("a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence ... and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.") (Plaintiff's Reply to Defendants' Memorandum of Law in Opposition to Plain-

tiff's Motion for Partial Summary Judgment, p. 7).

Because of Plaintiff's latter statement that evidence of malice may bolster the inference of actual malice, the Court has reviewed the evidence in regard to the issue of actual malice.[26] The Court initially opines that the July 1992 newspaper article is not proper evidence for submission on summary judgment as it is inadmissible hearsay and Plaintiff has not shown that the author of the article will be available for cross-examination at trial. Fed.R.Evid. 802; *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985) (inadmissible hearsay may not be considered on summary judgment motion absent a showing that admissible evidence will be available at trial). However, even if the evidence were admissible and proper for submission, the Court finds that the newspaper article as well as the other evidence cited by Plaintiff in his statement of material facts are not sufficient alone or in combination with all other evidence presented by Plaintiff to establish with convincing clarity that Defendants had knowledge the alleged defamatory statements in *PrimeTime I* and *PrimeTime II* were false or that they entertained serious doubts as to the truth of those statements.

Based upon the foregoing, the Motion for Summary Judgment (Docket Entry # 244) filed by Defendants, American Broadcasting Companies, Inc., Robbie Gordon, Diane Sawyer and Kelly Sutherland is **GRANTED** and the Motion for Partial Summary Judgment (Docket Entry # 257) filed by Plaintiff, Robert G. Tilton, is **DENIED.** Judgment shall issue forthwith.

---

26. In regard to the issue of "malice," the Court finds that the evidence cited by Plaintiff is irrelevant since the Court has found that Plaintiff is not entitled to summary judgment on his claims.